IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| OMNI STAFFING SERVICES, INC, a Washington corporation, | ) ) ) | No. 40417-0-III |
| Respondent, | ) ) | |
| v. | ) ) | |
| CALDERA PARTNERS LIMITED PARTNERSHIP, a Washington limited partnership; FRANKLIN HILLS HEALTH—SPOKANE, LLC, a Washington limited liability company; GARDENS ON UNIVERSITY— SPOKANE VALLEY, LLC, a Washington limited liability company; and OTHELLO NURSING & REHAB, LLC, a foreign limited liability company, | ) ) ) ) ) ) ) ) ) ) ) ) ) | UNPUBLISHED OPINION |
| Appellants. | ) | |

FEARING, J. — Defendants Gardens on University—Spokane Valley, LLC,

Franklin Hills Health—Spokane, LLC, and Othello Nursing & Rehab, LLC (collectively

the Facilities) appeal the superior court's enforcement of a settlement agreement with

Omni Staffing Services, Inc. (Omni). We affirm the superior court because the parties

reached an agreement on all material terms, while, at the same time, the Facilities

expressed an intent to be bound.

No. 40417-0-III
*Omni Staffing Srvs., Inc. v. Caldera Partners Ltd. P'ship.*

FACTS

Appellants, the Facilities, are subsidiary companies of Caldera Partners Limited Partnership (Caldera). Respondent Omni promotes itself as Washington's largest temporary employment agency for professional staffing in the health care industry. The Facilities entered into written service agreements with Omni to provide temporary staff. The agreements obligated the Facilities to pay Omni's invoices within 30 days of the end of the month during which Omni provided the services. The service agreements also read that Omni could bill the Facilities for "crisis rates" at higher-than-normal contractual rates. Clerk's Papers (CP) at 15.

Omni regularly sent monthly invoices to the Facilities. The Facilities failed to pay amounts owed under the service contracts.

Between October 4, 2023, and November 17, 2023, Chaim Wolmark, Chief Executive Officer (CEO) of the Facilities, and Corbin Moberg, owner of Omni, exchanged text messages. On October 9, Wolmark texted Moberg an offer to pay $50,000 toward the total amount owed under the parties' initial service agreements. Wolmark wired the $50,000 payment to Moberg on October 10. Moberg acknowledged his receipt of the wire transfer.

The October 9, 2023 texts read in part:

[From Chaim Wolmark]  1:35 PM

2

I never said anything about paying in full. You texted me about the balance getting too high and I asked you if we can wait until this week to make a payment and you said that was ok. Please see your texts below. As agreed upon, I'm happy to make a payment today but not under threat of pulling staff by tomorrow.

[From Corbin Moberg] 01:36 PM
On a similar note, if you're not intending to be caught up with all current invoices by Thursday, we need to make changes sooner. We cannot afford to continue paying staff and not getting paid by our customers.

[From Chaim Wolmark] 02:16 PM
I can get you a payment of $50k by tomorrow and then Eli and I will review all the bonuses by Wednesday and be in touch after that. But like I said, I don't do business under threats. Weve [sic] had a good relationship until now and I don't see why that should need to change.

[From Corbin Moberg] 02:20 PM
We will be OK with that.

[From Chaim Wolmark] 02:20 PM
Ok, sounds good. I'll get the payment out asap but please have Kritt rescind his threats.

October 10 texts read in part:

[From Chaim Wolmark] 10:09 AM
I'm sorry, but like I told you yesterday I'm not going to do business under threats. I had a wire for $50k ready to be sent today but it has been stopped for now. I will not have any further discussions until all of this behavior has been stopped. I cannot deal with a vendor who doesn't keep their word.

[From Corbin Moberg] 01:33 PM
I thought we had an agreement yesterday. Did something else happen after we spoke. It looks like the transfer was sent?

3

[From Corbin Moberg] 01:45 PM
Just to clarify we had an agreement yesterday you would send the money and you did. Part of that agreement included you would be reviewing the invoices Wednesday for payment to bring your account current by Thursday. This is no different [sic] than we spoke about last week. We will continue with business as usual while we are waiting for your review and Thursday payment. If you have questions or would like to discuss further please call me.

[From Corbin Moberg] 03:24 PM
This is interesting bank called said they a had a request to return the money I advised them to not return it. It sounds like our relationship has spiraled to the point we should probably take a break from working together. If I am missing something let me know. I am not interested in paying my staff and not at least having communications.

[From Chaim Wolmark] 03:36 PM
I already told you that I don't work with vendors that issues threats. Part of the agreement to send payment was that you would rescind the threats. Not only did that not happen but we were told this morning that you were still not booking any shifts. That's not "business as usual." That's you not keeping your part of the bargain. Unfortunately for me by the time I found out the wire has [sic] already been sent and despite trying to cancel it I was unable to. So I kept my part of the deal and You didn't keep your part of the deal.

CP at 105-06 (boldface omitted). We assume that, because the Facilities could not cancel the wire, Omni deposited the funds in one of its accounts.

Omni sued the Facilities on November 2, 2023. The complaint asserted a breach of contract claim against the Facilities totaling $291,961.17, plus late fees and interest. According to the complaint, Franklin Hills owed $143,807.98, Gardens owed $138,066.91, and Othello Nursing owed $10,086.28.

No. 40417-0-III
*Omni Staffing Srvs., Inc. v. Caldera Partners Ltd. P'ship.*

Omni's Corbin Moberg and the Facilities' Chaim Wolmark continued to communicate after the filing of the lawsuit. On November 11, 2023, the two texted:

> [From Chaim Wolmark] 11:48 AM
> Hi Corbin, We are trying to reconcile the invoices but are running into delays with your office. If I need to engage counsel to respond to your lawsuit then we have no deal. Just want you to be aware.
>
> [From Corbin Moberg] 01:04 PM
> Maybe you and I should discuss the specifics the office is struggling with. Are you free tomorrow morning to go through them individually. [sic]

Corbin Moberg and Chaim Wolmark continued the texting on November 12.

> [From Corbin Moberg] 09:12 AM
> Just got off the phone with her [the Facilities' accountant] we agree on about 270,000 owed please confirm and let me know what you think.
>
> [From Corbin Moberg] 09:52 AM
> Sorry 266,000 looks like the most accurate
>
> [From Chaim Wolmark] 10:18 AM
> I'd like a [sic] exact number please and does that include the $50k wire?
>
> [From Corbin Moberg] 10:26 AM
> She has the exact number and that does include the $50,000 wire.

CP at 109 (boldface omitted).

We may detect an ambiguity in the question posed by Chaim Wolmark in his 10:18 text together with Corbin Moberg's answer. We do not know if, when Wolmark

asked whether the number included the $50,000 wire, inclusion meant that the $50,000 has already been deducted from the total amount owed by the Facilities to reach the $266,000 figure.  Or if, when Wolmark posed his question, inclusion meant the $50,000 will be included into the amount owed such that, after giving credit for the payment, the Facilities would owe the total amount of $216,000.

Thereafter the parties' counsels assumed settlement negotiations.  On November 30, 2023, Omni's counsel, Mitchell Heaps, e-mailed a settlement offer to the Facilities' counsel, Jeffrey Possinger.  Omni offered to settle for $220,000.  Heaps attached to the e-mail invoices for the services Omni provided to the Facilities.  The invoices reflected revisions Omni made to the amount owed for Omni's services after discussion with the Facilities' accounts payable clerk.

Mitchell Heaps' November 30 e-mail declared, in part:

> To that end, I have attached the billing statements you requested, which reflect the revisions our client made after discussion with your client's A/P personnel.
> To be clear, Omni does not necessarily agree with these revisions, but for purposes of settlement, they are included here.  Nor do the statements show the $50,000 that was received from your client via wire transfer.
> With that in mind, I have been authorized to accept $220,000, payable over 90 days, as our client's offer of settlement.

CP at 44.  We assume that, when Heaps wrote that the statements did not show the $50,000 received by wire, Omni had not credited the Facilities for the $50,000 payment.

6

Mitchell Heaps attached three billings to his November 30 e-mail. One statement showed that the Franklin Hills facility in Spokane owed Omni $167,239.25 for services. A second statement declared that the Garden's on University facility in Spokane Valley owed $138,966.91. The final statement indicated that the Othello Care facility in Othello owed $10,086.28. The total reached $316,292.44. A deduction of $50,000 from this amount leaves $266,294.44 such that Omni's offer to settle cut the debt by $46,294.44. The Facilities would pay 82.6 percent of the debt owed assuming that the Facilities would pay $220,000 without getting a credit against that amount for $50,000.

Attorney Jeffrey Possinger, on behalf of the Facilities, rejected the offer contained in Mitchell Heaps' November 30 e-mail. On December 7, 2023, the Facilities, through counsel, counteroffered to pay $215,000. The counteroffer e-mail read:

> Thank you for sending over this proposed settlement. I have reviewed the case and talked with my clients about your client[']s offer. If your client is willing to accept $215,000.00 payable over 90 days, we have an agreement, and you and I can work towards finalizing the exact terms. Let's see if we can get this resolved within the next week.

CP at 49. The e-mail did not suggest that the Facilities would deduct $50,000 from its $215,000 payment.

On December 8, 2023, Omni accepted the counteroffer. In accepting the counteroffer, Omni requested that the Facilities' attorney Jeffrey Possinger draft a CR 2A settlement agreement for the parties to sign. Possinger agreed to the request.

7

On December 19, Jeffrey Possinger e-mailed Omni's counsel, Mitchel Heaps, a proposed CR 2A settlement agreement draft. Heaps made a small change to the draft and returned it to Possinger. On December 20, Possinger sent Heaps the following e-mail:

> Please find attached to this e-mail an update [sic] draft of the Settlement Agreement. I accepted your edits, and made some additional changes. I think that this should be acceptable to all parties.

CP at 67, 68-73 (draft agreement). Later that same day, Heaps responded that Omni accepted the proposed changes. Omni's CEO signed the agreement on December 27, and Heaps signed on January 2, 2024.

Some of the paragraphs in the signed settlement agreement read:

> 2. <u>Settlement</u>. As consideration for this Agreement, CALDERA CARE [the Facilities] shall pay OMNI $215,000.00 (two-hundred-fifteen-thousand 00/100 Dollars) (the "Settlement Amount"), and in full satisfaction of all claims OMNI alleged, or could have alleged in the underlying litigation.
> 3. <u>Payments</u>. The Settlement Amount shall be made in 3 payments as set forth below: $71,666.00 to be received by OMNI within 30 days of the date of execution of this Agreement by all Parties; and $71,666.00 and $71,657 to be received by OMNI 60 and 90 days following execution of this Agreement respectively.
> . . . .
> 14. <u>Attorney's Fees</u>. If a breach of this agreement is shown, the prevailing party may recover, in addition to damages, the reasonable costs and fees, including attorney's fees, incurred in proving the breach and securing judicial relief.

CP at 77-79 (alterations in original).

On January 5, 2024, Jeffrey Possinger e-mailed Mitchel Heaps:

> I spoke with my client [the Facilities] regarding the settlement between our two clients. It appears that one of the fundamental assumptions made as we were discussing this was that the $50,000.00 payment previously made by our client had been applied to the balance that was being referenced in our discussions. As you may recall, part of the dispute between our clients was Caldera Care's desire to get update [sic] numbers from Omni with regard to balances owed. We had agreed to the 215,000.00 based on the assumption that $50,000.00 had been applied to Omni's balance. It appears that this did not actually happen, so we would still agree to the amount reached by our clients $215,000.00, but a credit of $50,000.00 needs to be applied, and my client would pay your client $165,000.00 under this agreement. We'll need to update our agreement accordingly.

CP at 83. Heaps responded:

> We certainly made no such assumptions. Omni offered $220,000 originally, as we acknowledged receipt of the $50,000 wire transfer. Your client rejected that offer and countered with $215,000, which Omni accepted. You then, personally, drafted the Settlement Agreement, making no mention of any purported "credit." Had you done so, Omni would have never accepted those terms.
> The Agreement defines the settlement amount as $215,000. [I]t is clear and unambiguous and in line with your e-mail/counteroffer to me. The Agreement provides for three equal installment payments over the course of 90 days, totaling $215,000, not $165,000. There was no misunderstanding.
> Let me know if your client intends to honor the parties' agreement, or if a motion to enforce the CR 2A will be necessary. If so, we will seek an award of attorney's fees and costs pursuant to the agreement.

CP at 84.

9

PROCEDURE

On February 14, 2024, Omni filed a motion for an order enforcing the CR 2A settlement agreement. Omni argued it accepted the terms of the Facilities' counteroffer on December 20, and the e-mail exchanged between counsel, in addition to the agreement signed by Omni, created an enforceable settlement agreement under CR 2A. With the motion, Omni filed a declaration of Mitchell Heaps with exhibits attached. The attached exhibits included the e-mail communications between counsel regarding the terms of the agreement and the three draft agreements exchanged between counsel.

In response to Omni's motion, Chaim Wolmark, CEO of the Facilities, filed a declaration, to which Wolmark attached the text messages sent between Corbin Moberg, owner of Omni, and himself in October and November 2023. The Facilities argued that the two parties had never reached an agreement. They claimed the November 12, 2023, texts between Moberg and Wolmark were ambiguous as to whether the $266,000 claimed to be owed included a credit for the Facilities of the $50,000 wire. The Facilities did not explain why, if they expected a credit for $50,000, its attorney's December 7 e-mail offered to pay $215,000 over 90 days without any mention of a credit against the $215,000. The Facilities did not explain in their response why they failed to insert in the settlement agreement language that the $50,000 wire amount would be deducted from the $215,000 settlement figure. The Facilities did not explain why the settlement agreement

specified two payments of $71,666 and one payment of $71,657 if $50,000 would be deducted from the $215,000. Those three payments totaled $214,989. The Facilities did not argue that one or both parties labored under a mistake that voided the settlement agreement. The Facilities argued that the settlement agreement did not fulfill the requirements of an agreement under CR 2A and RCW 2.44.010.

The superior court granted Omni's motion to confirm the settlement agreement. The court concluded that the attorneys' December 7 and 8 e-mails satisfied the requirements for an enforceable settlement under CR 2A.

The Facilities filed a motion for reconsideration, in which they asserted for the first time the defense of mistake. The superior court denied the motion. The Facilities does not appeal the denial of the motion for reconsideration.

## LAW AND ANALYSIS

The Facilities appeal the superior court's order enforcing a settlement agreement on four grounds. First, the texts between the parties' counsels did not address all the terms needed to reach an enforceable agreement. Second, the Facilities never expressed an intent to be bound to any agreement. Third, mutual mistake warrants rescinding the settlement agreement. Fourth, unilateral mistake merits rescinding the agreement.

The Facilities ask this court to rule that the parties never reached a binding agreement and remand for the parties to proceed with litigation. They do not ask that the

court adopt its version of the agreement, under which they should be credited $50,000

against the $215,000 settlement agreement.

## Standard of Review

This court reviews a trial court's decision on a motion to enforce a CR 2A

settlement agreement de novo because the motion parallels one for summary judgment.

*Lavigne v. Green*, 106 Wn. App. 12, 16, 23 P.3d 515 (2001); *Fairway Collections, LLC v.

Turner*, 29 Wn. App. 2d 204, 226-27, 540 P.3d 805 (2023).  Summary judgment

procedures apply to a motion to enforce a settlement agreement under CR 2A.  *Fairway

Collections, LLC v. Turner*, 29 Wn. App. 2d 204, 226-27 (2023).  The moving party has

the burden to prove, in the light most favorable to the nonmoving party, that no genuine

dispute exists regarding an agreement's existence or material terms.  *Fairway

Collections, LLC v. Turner*, 29 Wn. App. 2d 204, 226-27 (2023).

## Court Rule and Statute

CR 2A and RCW 2.44.010 govern enforcement of a settlement agreement.

*Lavigne v. Green*, 106 Wn. App. 12, 16 (2001); *Morris v. Maks*, 69 Wn. App. 865, 868,

850 P.2d 1357 (1993).  CR 2A provides:

> No agreement or consent between parties or attorneys in respect to
> the proceedings in a cause, the purport of which is disputed, will be
> regarded by the court unless the same shall have been made and assented to
> in open court on the record, or entered in the minutes, or unless the
> evidence thereof shall be in writing and subscribed by the attorneys

12

denying the same.

Under CR 2A, the court will entertain a motion to enforce a purported settlement agreement only if the parties or their attorneys reached the agreement in relationship to the pending case. *Lavigne v. Green*, 106 Wn. App. 12, 17 (2001); *In re Marriage of Ferree*, 71 Wn. App. 35, 39, 856 P.2d 706 (1993). Decisions also suggest that the parties must dispute the "purport" of the agreement for the court to entertain a motion, but obviously a dispute exists if a party files a motion. *Lavigne v. Green*, 106 Wn. App. 12, 17 (2001). CR 2A supplements, not supplants, the common law of contracts. *Lavigne v. Green*, 106 Wn. App. 12, 17 (2001). The civil rule "precludes enforcement of a disputed settlement agreement not made in writing or put on the record, whether or not common law requirements are met." *In re Marriage of Ferree*, 71 Wn. App. 35, 39-40 (1993).

Under RCW 2.44.010,

> An attorney and counselor has authority:
> (1) To bind his or her client in any of the proceedings in an action or special proceeding by his or her agreement duly made, or entered upon the minutes of the court; but the court shall disregard all agreements and stipulations in relation to the conduct of, or any of the proceedings in, an action or special proceeding unless such agreement or stipulation be made in open court, or in presence of the clerk, and entered in the minutes by him or her, or signed by the party against whom the same is alleged, or his or her attorney.

*Morris v. Maks*, 69 Wn. App. 865, 869 (1993) adopted a three-prong test for enforcement of a settlement based on an informal writing:

13

> In determining whether informal writings such as letters are sufficient to establish a contract even though the parties contemplate signing a more formal written agreement, Washington courts consider whether (1) the subject matter has been agreed upon, (2) the terms are all stated in the informal writings, and (3) the parties intended a binding agreement prior to the time of the signing and delivery of a formal contract.

The Facilities assert that the December 2023 e-mail exchange between counsel did not satisfy elements two and three of this standard. They impliedly concede that the e-mails satisfied element one.

The Facilities argue that the trial court erred in finding that the December 2023 e-mails stated all terms of the settlement. According to the Facilities, the communications failed to mention the total settlement amount. The e-mails omitted any mention of whether the parties would deduct the recent $50,000 payment from the $215,000 settlement amount. In response, Omni emphasizes that it relied not only on the e-mail communication but also the settlement agreement drafted by the Facilities' counsel, Jeffrey Possinger. The settlement agreement reads that the Facilities will pay $215,000 with no mention of a credit. According to Omni, the CR 2A agreement prepared by counsel contained all necessary terms. Omni accepted the proposal.

In *Morris v. Maks*, 69 Wn. App. 865 (1993), Evan Morris, a partner in a limited partnership, sued the general partner, Thomas Maks, alleging Maks breached the fiduciary duty he owed as general partner. After settlement discussions between the

parties, counsel for each party spoke over the phone to confirm the details of the settlement. Maks' attorney told Morris' attorney that the agreement was acceptable to Maks, subject to approval by his tax advisor. The next day, Maks' attorney informed Morris' attorney that the tax consequences of the agreement were acceptable to Maks. Morris' attorney requested that Maks' attorney confirm the parties had a settlement agreement. When Maks' attorney agreed the parties had a settlement agreement, Morris' attorney prepared a confirmation letter on July 19. Maks' attorney responded to the letter with a letter of his own on July 25, which provided, in part, "[e]xcept as specifically set forth below, your letter accurately reflects the terms of the agreed settlement. I view the items listed below as clarifying or supplemental points rather than conflicts with your letter." *Morris v. Maks*, 69 Wn. App. 865, 867-68 (1993). Approximately two weeks later, after speaking with a different tax consultant, who advised Maks of detrimental tax consequences of the settlement, Maks' attorney told Morris' attorney that Maks was terminating the settlement agreement. The trial court entered an order enforcing the settlement agreement as written in the parties July 19 and 25 confirmation letters.

On appeal from the trial court's order enforcing the settlement agreement, Thomas Maks argued that the confirmation letters did not constitute a binding settlement because they did not address all material terms of the agreement "such as warranties, outstanding liabilities, and the form of the lease agreement." *Morris v. Maks*, 69 Wn. App. 865, 869

15

(1993). Maks further argued that the letters did not evidence an intent to be bound on his behalf. This court disagreed.

Regarding the material terms of the agreement, this court recognized that the July 25 letter from Thomas Maks' attorney to Evan Morris' attorney provided that the July 19 letter accurately reflected the terms of the parties' settlement agreement. Although drafts of the agreement that were created after July 25 may have been more detailed, they did not alter the terms of the agreement. As for the parties' intent to be bound, this court determined that the evidence established the requisite intent. This court opined:

> First, the July 19 letter expressly states, "[t]his will confirm your assurance to me that Tom Maks has agreed to this settlement and I have confirmed Evan Morris' approval." Second, the July 25 letter written by Maks' attorney stated that the July 19 letter accurately reflected the terms of the agreed settlement. Finally, Maks represented to the bank on July 24 that he had settled the case with Morris.

*Morris v. Maks*, 69 Wn. App. 865, 871 (1993) (alteration in original). Because the parties agreed to the subject matter, the letters outlined the material terms, and evidence established that the parties intended to be bound by the letters, this court concluded that the trial court did not err in enforcing the settlement agreement under CR 2A and RCW 2.44.010.

The Facilities argue that, unlike in *Morris v. Maks*, 69 Wn. App. 865 (1993), where the repudiating party had provided a signed letter that stated that all negotiated

16

terms were accurate and appropriate and did not contain any qualifying language, Jeffrey

Possinger included in his counteroffer e-mail to Mitchell Heaps on December 7 language

indicating that the Facilities' consent was dependent on either additional specific terms or

the approval of the parties themselves. The relevant counteroffer e-mail, sent by

Possinger to Heaps on December 7, read:

> Thank you for sending over this proposed settlement. I have reviewed the case and talked with my clients about your clients offer. If your client is willing to accept $215,000.00 payable over 90 days, we have an agreement, and you and I can work towards finalizing the exact terms.

CP at 49. The e-mail language did not suggest that the Facilities' consent depended on

their approval of the agreement, like they claim on appeal. This language indicated that

the Facilities agreed to pay $215,000 over 90 days, and the parties would finalize more

exact terms of that payment in the future, if Omni accepted the offer.

Once counsel for Omni agreed to a settlement amount on December 8, Jeffrey

Possinger drafted a CR 2A settlement agreement outlining the agreed upon terms. The

initial draft agreement, and the two draft agreements that followed, required the Facilities

pay a total of $215,000, in three installment payments of $71,666, over 90 days, with the

pay period beginning on the execution of the agreement. That term reflects what Omni

agreed to on December 8, and it includes language finalizing the specifics of the accepted

term. Importantly, when Possinger e-mailed Mitchell Heaps the final draft of the CR 2A

agreement, Possinger wrote that he considered the terms in the draft to be acceptable to all parties, indicating their finality.

Although Jeffrey Possinger indicated in his December 7 counteroffer e-mail that the details of the payment needed to be finalized on Omni's acceptance of that term, any such details had been finalized by the time Omni signed the draft agreement proposed by Possinger on December 20. And, contrary to the Facilities' argument, Possinger's statement that he believed all terms in that draft agreement to be acceptable to all parties aligns with the statement the repudiating party's attorney made in *Morris v. Maks*, 69 Wn. App. 865 (1993), "[e]xcept as specifically set forth below, your letter accurately reflects the terms of the agreed settlement." *Morris v. Maks*, 69 Wn. App. 865, 867-68 (1993).

*Lavigne v. Green*, 106 Wn. App. 12 (2001) also supports Omni's position. James Lavigne, an artist who rented building space for his office, sued Ron Green, a neighboring tenant who started a fire that spread to Lavigne's office, for damages resulting from the loss he suffered due to the fire. Lavigne and Green reached a settlement agreement totaling $100,000. After reaching this agreement, Lavigne's attorney asked the insurance adjuster on the case "if she would like three weeks to forward the check. She stated that it was only a matter of writing a check." *Lavigne v. Green*, 106 Wn. App. 12, 15 (2001). The insurance adjuster agreed that Lavigne's claims

were settled for $100,000 and stated that "[t]here were no additional terms of provisions or conditions on the settlement." *Lavigne v. Green*, 106 Wn. App. 12, 15 (2001). Lavigne refused to sign the settlement agreement Green's insurance company sent to him because "it was his understanding that the mediation process was voluntary and that he would not be bound by any settlement arising out of it until he actually signed the settlement agreement." *Lavigne v. Green*, 106 Wn. App. 12, 15 (2001). Lavigne also refused to sign the agreement because the mediator and his attorney pressured him to accept the inadequate settlement amount of $100,000 and the agreement purportedly contained additional terms to which he had not agreed.

Ron Green moved to enforce the settlement agreement, and the trial court granted his motion. James Lavigne appealed, arguing that CR 2A and RCW 2.44.101 precluded the enforcement of the disputed settlement agreement. According to Lavigne, the agreement was not enforceable because, (1) it was not reduced to a writing and signed by him or made on the record in open court and, (2) it contained material terms to which he did not agree.

This court concluded that James Lavigne raised genuine issues of fact regarding whether the settlement agreement was disputed within the meaning of CR 2A and that disputed material facts existed regarding whether the parties achieved an enforceable agreement. In coming to this conclusion, this court reasoned:

Mr. Lavigne raises issues regarding whether the parties' failure to address other terms of the agreement rendered it disputed for the purpose of CR 2A or unenforceable as a contract. Mr. Green concedes that the parties did not address the terms of the release, indemnity, and hold harmless provisions of the agreement. Ordinarily, the terms of the release, indemnity, and hold harmless agreement are material. *See, e.g., Howard v. Dimaggio,* 70 Wn. App. 734, 855 P.2d 335 (1993). Here, the terms of the indemnity, hold harmless, and release provisions may or may not be material; to this point, Mr. Lavigne has not identified any liability or adverse consequence to which he would be exposed by the terms of these provisions and he has not offered any evidence of subrogated or lienable claims.

Mr. Lavigne also questions whether it was an enforceable contract. Settlement agreements are governed by general principles of contract law. *Stottlemyre v. Reed,* 35 Wn. App. 169, 171, 665 P.2d 1383 (1983). In determining whether settlement discussions are sufficient to establish a contract even though the parties contemplate a formal agreement, we consider, among other things, whether the parties have addressed all the material terms of the agreement. *Morris v. Maks,* 69 Wn. App. 865, 869, 850 P.2d 1357 (1993). Here, the evidence shows that the parties agreed only to the amount of the settlement.

*Lavigne v. Green*, 106 Wn. App. 12, 20 (2001).

The Facilities argue that, like in *Lavigne v. Green*, 106 Wn. App. 12 (2001) the parties' terms were subject to revision and change before finalizing the settlement as demonstrated by the continued discussion on terms surrounding the $50,000 payment. According to the Facilities, that continued discussion added updated or disputed terms regarding the total settlement amount, which terms precluded enforcement of the agreement.

The Facilities' reliance on *Lavigne v. Green*, 106 Wn. App. 12 (2001) is misplaced. First, this court in *Lavigne v. Green*, 106 Wn. App. 12 (2001) did not address whether the terms in the parties' agreement were subject to change. Instead, this court reversed and remanded because the parties' failure to address certain material terms during mediation created issues of material fact regarding whether the agreement was disputed for purposes of CR 2A and whether there was an enforceable agreement. The court focused on the lack of material terms in the agreement, not on the terms in the agreement being subject to change. Second, the Facilities do not argue that its agreement is unenforceable and disputed for purposes of CR 2A because it lacked release, indemnity, and hold harmless terms.

Jeffrey Possinger's e-mail regarding the $50,000 was sent on January 5, days after he and Mitchell Heaps agreed on the terms of the draft agreement Possinger sent on December 19. By January 5, the parties had finalized the agreement and counsel for each party reached a meeting of the minds as to those terms. Therefore, any discussions between counsel regarding the wire payment that occurred after Omni's acceptance of the final draft agreement did not constitute updated or disputed terms and therefore had no impact on the existence of the CR 2A agreement under *Lavigne v. Green*, 106 Wn. App. 12 (2001).

The record supports the trial court's conclusion that the parties' e-mails contained all terms of the agreement. On December 7, 2023, Jeffrey Possinger, counsel for the Facilities, replied to an e-mail sent by Mitchell Heaps regarding a proposed settlement offer. Possinger's e-mail contained a counteroffer:

> Thank you for sending over this proposed settlement. I have reviewed the case and talked with my clients about your clients offer. If your client is willing to accept $215,000.00 payable over 90 days, we have an agreement, and you and I can work towards finalizing the exact terms. Let's see if we can get this resolved within the next week.

CP at 49. Heaps responded the next day and, on behalf of Omni, accepted the $215,000 settlement amount, payable over 90 days. He requested that Possinger draft the CR 2A agreement. Possinger agreed to do so, and he sent an initial draft agreement to Heaps on December 19. On December 20, Heaps' legal assistant sent Possinger an e-mail with a second draft agreement attached. The attached draft was the same copy of the draft Possinger had earlier sent Heaps, but this new draft contained edits made by Heaps. Later that same day, Possinger shared with Heaps a third draft settlement agreement, which incorporated Heaps' proposed edits and added additional language. Possinger wrote in his e-mail that "this [draft] should be acceptable to all parties," indicating his belief that it was acceptable to his clients and that it would be acceptable to Omni. CP at 67. Heaps accepted the third draft, and both he and Omni's CEO signed the agreement before returning it to Possinger for his signature and that of the Facilities.

22

Notably, each draft agreement included the language:

> 2. <u>Settlement</u>.  As consideration for this Agreement, CALDERA CARE [the Facilities] shall pay OMNI 215,000.00 (two-hundred-fifteen thousand 00/100 Dollars) (the "Settlement Amount"), and in full satisfaction of all claims OMNI alleged, or could have alleged in the underlying litigation.
> 3. <u>Payments</u>.  The Settlement Amount shall be made in 3 payments as set forth below: $71,666.00 to be received by OMNI within 30 days of the date of execution of this Agreement by all Parties; and $71,666.00 and $71,657 to be received by OMNI 60 and 90 days following execution of this Agreement respectively.

CP at 53-54.

Next the Facilities argue that Jeffrey Possinger never expressed a present intent for the Facilities to be bound in his December 2023 e-mail communications with Mitchell Heaps.  According to the Facilities, when viewing the evidence in the light most favorable to them, the parties' e-mail communications expressed at most a future intent to be bound, as indicated by the qualifying language Possinger used in his counteroffer e-mail to Heaps.

Washington employs the objective manifestation theory of contracts, under which courts determine the parties' intent based on the objective manifestations of the agreement, not the unexpressed subjective intent of the parties.  *Condon v. Condon*, 177 Wn.2d 150, 162, 298 P.3d 86 (2013).  The fact that the parties contemplated drafting a

23

formal settlement agreement does not necessarily mean that they intended to be bound only upon execution of that document. *Morris v. Maks*, 69 Wn. App. 865, 872 (1993).

The e-mail communications shows that the Facilities held a present intent to be bound as soon as December 7. On December 7, Jeffrey Possinger sent Mitchell Heaps an e-mail containing a counteroffer. In the e-mail, Possinger wrote that, if Omni accepted the counteroffer, the parties would have an agreement. When delivering the third and final draft agreement to Heaps on December 19, Possinger wrote that he believed the terms outlined therein would be acceptable to all parties. This language indicates his belief that the terms were acceptable to his clients.

The superior court did not err in finding that the correspondence between counsel for Omni and the Facilities satisfied all requirements of the *Morris v. Maks*, 69 Wn. App. 865 (1993) standard even without the formal settlement agreement.

## Omni Concession

The Facilities argue that the superior court overlooked Mitchell Heaps' admission during oral argument that the Facilities' intent was based on speculation. During oral argument, Mitchell Heaps intoned:

> This was really a quick and easy negotiation settlement. And Counsel, I mean, to say that the—to quote himself, "I think that this is all the issues," that's—that's *how parties talk. That's just quick e-mail language. I don't think in his mind he was saying that we don't have everything resolved, because if we didn't have everything resolved, he*

24

> *would put on a declaration saying what's not resolved.* That's the issue. And for that reason, we think that the CR 2A that he drafted and we signed is the agreement of the parties, and we're asking the Court to enforce it.

Rep. of Proc. at 18 (emphasis added). The Facilities rely on the emphasized language to support their argument. Nevertheless, that language does not indicate that Heaps conceded the Facilities' present intent to be bound was based on speculation. This language demonstrates that Heaps understood, based on Possinger's e-mails, that an agreement had been reached and the Facilities intended to be bound by the terms outlined therein.

## Mistake

The Facilities ask this court to invalidate the settlement agreement either under mutual mistake or unilateral mistake. The Facilities did not raise the issue of mistake in its response to the motion for enforcement of a CR 2A settlement agreement. Although the Facilities disagree, they cite nowhere in the record where they asserted this argument in their brief in opposition to the motion or during oral argument.

The Facilities asserted mistake in their motion for reconsideration. The Facilities did not, however, appeal the denial of the motion.

We decline to entertain the Facilities' argument of mistake. RAP 2.5(a) provides that this court may refuse to review any claim of error not raised before the trial court.

*Attorney Fees*

Omni seeks an award of reasonable attorney fees and costs as the prevailing party on appeal pursuant to the terms of the settlement agreement. We grant the request.

CONCLUSION

We affirm the superior court's affirmation of the settlement agreement between Omni and the Facilities. We award reasonable attorney fees and costs to Omni.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Cooney, J.

_____
Lawrence-Berrey, C.J.